# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JOSHUA WAYNE PERRY, ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| v. ) | Civil No. 3:05-0599 |
| ) | Judge Trauger |
| SEAN QUEEN, DAWN LENIGER, ) | |
| CAPPS DRIVE TRUST, and ROYALTY ) | |
| PROPERTIES, LLC ) | |
| ) | |
|     **Defendants.** ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction. (Docket No. 3) The plaintiff has responded to this motion (Docket No. 9), and the defendants have replied (Docket No. 15). For the reasons expressed herein, the defendants' motion will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, a low income homeowner with a high school education, has resided at 3013 Capps Drive, Nashville, TN 37207 since 1977. (*See* Docket No. 5 ¶¶ 1, 8) This property is encumbered by two mortgages, both of which have been held in his name at all times relevant to this case. (*See id.* ¶¶ 9-11; Docket No. 10 at 4) In 2004, the plaintiff received notice that the second mortgagee was going to institute foreclosure proceedings because the plaintiff had become delinquent on that account. (*See id.* ¶ 12)

On or about August, 12, 2004, the plaintiff received a letter in the mail from defendant

1

Sean Queen ("defendant Queen"), the President of Royalty Properties, LLC. (*See id*. ¶ 13) The letter stated the following:

**HELP Has Arrived!**
**You Can Stop your Foreclosure Now!**

Dear Homeowner,

We are here to help people just like you. You can **STOP** your **foreclosure** in 5 days or less by letting us help you keep your home or by Selling your house for all **CA$H**.

**"YES"** we do have the **CA$H** to bring your payments current and **"YES"** we do have the **CA$H** to buy your house. It's your choice if you want to stay or move on. **We can Help!**

Here is a **$2,000.00 check** to show you we are serious about helping you. All you have to do is call us at **456-7000** and ask for Sean Queen so we can be on our way to signing it along with a 2nd check for the rest of the amount needed.

**Don't file for bankruptcy and ruin your credit!** Let us provide a better solution in keeping your home.

It doesn't matter what may have happened for you to be in the present situation, what does matter is that you are **treated right and with respect**.

Just ask the Taylors how we helped them **keep** their home and how they were able to say "Thanks so much for being honest and acting quick in a very distressful sitation. Without your help we would have lost our home. Thanks a million!"

Or just ask the Troups how we were able to **buy** their home in **less than 5 days** and how they were able to say "We appreciate so much working with someone **straight forward**. Thanks so much for acting quick to buy our house and for **keeping the foreclosure off our credit**. Now we can start over fresh. Thanks again."

These folks are real prople just like you that you can call for yourself.

Even if you are working on a solution for yourself, we encourage you to give us a call so we can be your **"back up" plan** in case your solution falls through.

**HELP** has arrived and it's just a phone call away! . . .

(Docket No. 1, Ex. 1) (emphasis in original).

Shortly after receiving the letter, the plaintiff contacted defendant Queen by telephone. (*See* Docket No. 5 ¶ 14) Soon thereafter, defendant Queen visited plaintiff at plaintiff's home. (*See id*.) Defendant Queen gave plaintiff $11,113.99, to be used as follows: approximately $3,841.99 would be used to bring plaintiff's mortgage payments current, approximately $2,272 would be used to make mortgage payments through January 2005, and approximately $5,000 would go directly to the plaintiff. (*See id*.) In exchange, the plaintiff executed a warranty deed, a Residential Lease Agreement, a Lease and Option Disclosure, and a Memorandum of Understanding. (*See* Docket No. 1, Exs. 3-6)

The warranty deed deeded to the defendants the title to the plaintiff's property.[1] (*See id*., Ex. 3) Under the Residential Lease Agreement, the plaintiff agreed to lease this property back from the defendants for one year, beginning on August 30, 2004. (*See id.*) As of January 5, 2005, the plaintiff was to pay the defendant $667.98 per month in rent. (*See id.*, Ex. 4 at 1) Finally, under the Lease Option and Disclosure and the Memorandum of Understanding, the plaintiff had an option to repurchase the property from the defendants. (*See* Docket No. 1, Exs.5-6) The plaintiff was required to pay approximately $44,708.71 by the end of his lease term in order to exercise the option.[2]

---

[1] Although the warranty deed states that the actual value or consideration given for the transfer was $24,000.00 (*see* Docket No. 1, Ex. 3 at 2), the evidence indicates that the actual consideration paid was $11,113.99, the amount defendant Queen gave to plaintiff (*see* Docket No. 5 ¶ 14).

[2] The $44,708.81 amount included the $11,113.99 the defendants gave to the plaintiff, a $10,000 fee, and the balance of the two mortgages that continued to encumber the property. (*See*

3

According to the Davidson County Property Assessor's Office, the Property is currently valued at $94,500. (*See* Docket No. 10 at 4) It is estimated that, at the time of the transaction, the outstanding balance of the two mortgage loans was $26,000, which means that the plaintiff had approximately $68,500 in equity in his property at the time of the transaction in question. (*See id.*) By August 30, 2005, when his lease ended, the plaintiff had not exercised his option to repurchase. (*See id.*) On September 7, 2005, the defendants served the plaintiff with a detainer warrant in an attempt to regain possession of the property.[3] (*See id.*)

On August 1, 2005, the plaintiff filed a Complaint alleging that the transaction described above was actually a mortgage loan transaction, with the property acting as security for the $11,113.99 the defendants gave to him. (*See* Docket No. 1 ¶ 1) The plaintiff argued that, because this was a mortgage loan transaction, the defendants were subject to certain disclosure and other requirements under the federal Truth in Lending Act ("TILA"). (*See id.*) According to the plaintiff, the defendants had failed to comply with all of these requirements. (*See id.* ¶ 23) Such failure, the plaintiff claimed, entitled him to actual and statutory damages and gave him a right to rescind the transaction up to three years after its consummation.[4] (*See id.* ¶ 24)

## ANALYSIS

**1.     Standard of Review.**

---

Docket No. 10 at 4) The option price was to be adjusted to reflect the payoff amount of the two mortgages at the time plaintiff exercised the option. (Docket No. 1, Ex. 6 at 3)

[3] Although the plaintiff sent the defendants a Letter of Intent to Exercise Option on or about May 31, 2005, the defendants did not respond to the letter and the plaintiff did not take further action to exercise his option. (*See* Docket No. 15 at 2; Docket No. 29)

[4] On June 30, 2005, the plaintiff sent the defendants written notices of rescission, which the defendants ignored. (Docket No. 1 ¶¶ 25-26)

4

Because a court that lacks subject matter jurisdiction over a case does not have the power to hear it, the question of subject matter jurisdiction may be raised at any time. *See Kontrick v. Ryan*, 540 U.S. 443, 445 (2004); *United States v. Alesida*, 129 F.3d 846, 850 (6th Cir. 1997). When a defendant attacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must meet the burden of proving jurisdiction by a preponderance of the evidence. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *Farmer v. Tenn. Air Nat'l Guard*, No. 2574-D/P, 2005 WL 2177004, slip op. at *2 (W.D. Tenn. Sept. 2, 2005).

A Rule 12(b)(1) motion may challenge the complaint on its face or it may contest the existence of subject matter in fact. If a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court "must weigh the evidence" in order to determine whether it has the power to hear the case. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004.) When the facts are disputed, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary." *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994). The court can do so without converting the Rule 12(b)(1) motion into a motion for summary judgment. *See id.*[5]

---

[5] In an Order dated November 16, 2005 (Docket No. 31), the court declared that defendants' Motion to Dismiss would be "treated as," but not "converted to," a motion for summary judgment so that matters outside the pleading could be considered to determine whether the court lacked subject matter jurisdiction under Rule 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1). This Order was improvidently issued, however, because the rule articulated in 12(b)–that a motion to dismiss will be treated as a motion for summary judgment if matters outside the pleadings are presented to the court–extends only to motions to dismiss brought pursuant to 12(b)(6), and does not include motions to dismiss for lack of jurisdiction under 12(b)(1). *See* Fed. R. Civ. P. 12(b).

The defendants here factually dispute the existence of subject matter jurisdiction. They claim that this court does not have jurisdiction to hear the plaintiff's claims because he has failed to state a federal cause of action. (*See* Docket No. 4 at 6) Specifically, the defendants assert that TILA does not apply to the plaintiff's case and that, because each of the plaintiff's federal claims turns on TILA, they are not properly before the court.[6] (*See id.*)

2.      **This Court has Subject Matter Jurisdiction over the Plaintiff's Claims**

In evaluating whether TILA governs the sale/leaseback transaction at issue in this case, the court must determine whether it qualifies as an equitable mortgage.[7] Both parties agree that, if the transaction does so qualify, it is subject to the provisions of TILA. (*See* Docket No. 10 at 6; Docket No. 4 at 5-6) A consumer credit transaction qualifies as a mortgage under TILA if two contingencies are met: (1) the transaction is secured by the consumer's principal dwelling; and (2) the annual percentage rate at the consummation of the transaction exceeds a particular amount or the total points and fees payable by the consumer at or before closing exceeds the greater of a) 8 percent of the total loan amount; or b) $400.[8] *See* 15 U.S.C. § 1602(aa)(1).

The latter of these qualifications is not disputed in the case at hand. Defendant Queen gave

---

[6]Federal courts have jurisdiction over claims arising under TILA. *See* Truth in Lending Act, 15 U.S.C. § 1640(e) (2000) ("Any action under [TILA] . . . may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.").

[7] Under Tennessee law, an equitable mortgage exists when "deeds purporting to convey an absolute legal and equitable title were, in fact, meant to grant only a security interest." *Hensley v. Britt*, No. 01A01-9607-CH-00296, 1996 WL 709375, at *5 (Tenn. Ct. App. Dec. 11, 1996).

[8] For 2004, the year in which the instant transaction was executed, the $400 figure was adjusted to $499 to account for inflation. *See* 12 C.F.R. § 226.32(a)(1)(ii)(2) (2005).

6

the plaintiff $11,113.99. (*See* Docket No. 5 ¶ 14) If and when the plaintiff paid off that loan, the plaintiff was required to pay a $10,000 fee, which is well in excess of the amount required under TILA. *See* 15 U.S.C. § 1602(aa)(1). Accordingly, the court must focus its analysis on whether the transaction between the plaintiff and the defendants was secured by the plaintiff's principal dwelling.

In Tennessee, proof that a conveyance was intended as a security must establish that (1) the grantor was indebted to the grantee; and (2) the grantor intended his conveyance to serve as a security device. *Hensley v. Britt*, No. 01A01-9607-CH-00296, 1996 WL 709375, at *5 (Tenn. Ct. App. Dec. 11, 1996); *see also Flack v. McClure*, 565 N.E.2d 131, 136 (Ill. App. Ct. 1990). The party asserting that a security interest was intended must prove that fact by clear and convincing evidence. *See, e.g., Swenson v. Mills*, 108 P.3d 77, 80 (Or. Ct. App. 2005); *Flack*, 565 N.E.2d at 135. Additionally, "the evidence that security only was intended may be written or oral. The statute of frauds is not a bar to proof by parol that a deed absolute on its face was meant as a mortgage." *Hensley*, 1996 WL 709375, at * 5.

The defendants here argue that the plaintiff was not indebted to them because he was not obligated to repurchase the property or pay any money to the defendants but, instead, could keep the money they had lent him in return for the deed to his home. (*See* Docket No. 15 at 3) Other courts have rejected similar arguments. For instance, in *Flack*, the plaintiff signed a contract to sell her house to the defendants for $80,000. *See Flack*, 565 N.E.2d at 132. On the day that the contract was signed, the plaintiff asked the defendants for an advance payment of $9,000. *Id*. The defendants loaned the money to the plaintiff in exchange for a quitclaim deed to her house. *Id*. The sale of the plaintiff's house to the defendants was never completed, however, because the defendants were unable to obtain the necessary financing. *Id*. The holder of the first mortgage on

7

the property later instituted a foreclosure action, and the house was purchased at the foreclosure sale by a third party. *Id*. In an effort to prevent the sale from being finalized, the defendants recorded their quitclaim deed and subsequently redeemed the property. *Id*. The court found that, because the defendants had agreed to return the quitclaim deed to the plaintiff when the $9,000 was repaid, the plaintiff was indebted to the defendants and the quitclaim deed served only as security for the $9,000 loan. *Id*. at 136-37.

Here, the defendants similarly had agreed to return the warranty deed to the plaintiff once he repaid to the defendants the $11,113.99 they had lent him plus defendant Queen's $10,000 fee and the $23,594.72 that approximately represented the aggregated principal amount of the two mortgages that encumbered the property. (*See* Docket No. 1, Ex. 6 at 1; Docket No. 10 at 4) In both *Flack* and the case at hand, the plaintiffs were not obligated to repay the defendants in an absolute sense, but they were required to do so if they wanted to retain ownership of their property. Accordingly, like the *Flack* plaintiff, the plaintiff here was indebted to the defendants. Having established the existence of a debt, the court now must evaluate whether the plaintiff intended his conveyance of the warranty deed to serve as a security device. *See Hensley*, 1996 WL 709375 at *5.

Tennessee courts consider a number of factors in determining the grantor's intent.[9]

---

[9] The defendants do not dispute the plaintiff's reliance on state law. Other courts in this circuit have looked, in part, to state law when determining whether a particular instrument qualified as a security interest. *See Gilkey v. Cent. Cleaning Co.*, 202 F.R.D. 515, 530 (E.D. Mich. 2001) (recognizing that TILA-related Regulation Z defined "security interest" as "an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law" and turning, in part, to Michigan law to determine whether a post-dated check secured the performance of customers' obligations to pay their debts) (citing 12 C.F.R. § 226.2(a)(25) (2005)).

8

Among these considerations are the following: (1) the relationship between the parties; (2) whether the parties had access to legal counsel; (3) the sophistication and circumstances of the parties; (4) the adequacy of consideration; and (5) whether the grantor retained possession of the property. *Hensley*, 1996 WL 709375, at *5. A number of the factors delineated in *Hensley* are material to the court's determination as to the plaintiff's intent.

The disparity between the parties as to their sophistication and the circumstances under which they were operating is particularly relevant. Courts view grantors who are lacking in sophistication or who are laboring under stressful circumstances as more likely to have intended their conveyances to serve as security devices, as opposed to as transfers of their land. *See, e.g.*, *Robinson v. Builders Supply & Lumber Co.*, 586 N.E.2d 316, 322 (Ill. App. Ct. 1991) (finding that a genuine issue of material fact existed as to the presence of an equitable mortgage in part because the plaintiff, a relatively unsophisticated party who had "never conducted any business affairs" was in "desperate circumstances" at the time that she completed her transaction with the defendant, who "was in the business of buying and rehabilitating distressed properties"); *Flack*, 565 N.E.2d at 137 (finding that an equitable mortgage existed based, in part, on evidence that plaintiff needed to raise money quickly because she was significantly behind on mortgage and school tuition payments). The plaintiff here has a high school education and has worked in the printing industry most of his life. (*See* Docket No. 5 ¶ 8; Docket No. 10, Ex. 1 at 1) There is no evidence in the record that indicates that he has experience in dealings involving property. Additionally, at the time of his transaction with the defendants, the plaintiff faced foreclosure on his second mortgage and felt "extremely desperate" about his financial situation. (*See* Docket No. 5 ¶ 12; Docket No. 10 at 11) The defendants, on the other hand, work in a business dedicated, at least in part, to arranging the type of transaction that is being questioned in this case. (*See* Docket

9

No. 1, Ex. 1 at 1)  The fact that the plaintiff is a relatively unsophisticated party who faced dire circumstances at the time of the transaction helps to compel the conclusion that he intended his conveyance to serve as a security device.  *See Robinson*, 586 N.E.2d at 322.

Similarly, the relatively low amount of consideration paid by the defendants in exchange for the plaintiff's warranty deed here furthers a determination that the plaintiff intended the deed to serve as security for the loan.  Where consideration received by the grantor is much less than the value of his property, there is an inference that a security device, as opposed to an outright sale, was intended.  *Hensley*, 1996 WL 709375, at *5.  The plaintiff's property is currently valued at approximately $94,500.  (Docket No. 5 ¶ 20)  At the time of his transaction with the defendants, the plaintiff purportedly had approximately $68,500 worth of equity in his house.  (*See* Docket No. 10 at 4)  Comparatively, the consideration paid by the defendants to the plaintiff was $11,113.99, or approximately 12% of the property's estimated value.  (*See id.*)  The discrepancy between the value of the property and the price paid by the defendants is indicative of the plaintiff's intent to convey it as a security device.  *See Hensley*, 1996 WL 709375, at *5; *see also Flack*, 565 N.E.2d at 137 (finding consideration to be inadequate where the plaintiff relinquished to the defendants a quitclaim deed on her $80,000 home in exchange for $9,000).

Also indicating the plaintiff's intent in this case is the fact that he retained physical possession of his house after he gave the defendants the warranty deed.  Where a grantor continues to occupy the premises, there is an inference that a security device was intended.  *See Hensley*, 1996 WL 709375, at *5.  The evidence that the plaintiff paid rent to the defendants while he lived on the property following their transaction, which might otherwise tend to indicate the defendants' possession of such (*see* Docket No. 1, Ex. 4 at 1), is mitigated by the fact that the two mortgages on the property remained in plaintiff's name, thus rendering him liable on them (*see* Docket No. 5

10

¶ 16). *See Hensley*, 1996 WL 709375, at *5 (suggesting that the payment of property-related costs serves as indicia of possession).

The last of the relevant *Hensley* factors directs the court to consider whether the parties to the transaction in question were represented by legal counsel. *See Hensley*, 1996 WL 709375, at *5. While the plaintiff did not have access to legal advice at the time the deal was executed, the defendant did. (*See* Perry Aff., Docket No. 10, Ex. 1 at 2 ("Mr. Queen drove me to an office where we met with a man who Mr. Queen identified as his attorney. The attorney handed me a stack of papers and told me to sign them.")) Like the other factors, this one also leads the court to a determination that the plaintiff intended his deed to serve as a security device. *See Flack*, 565 N.E.2d at 137 (upholding the finding of an equitable mortgage in part because the plaintiff did not have the advice of counsel upon executing the contested transaction, whereas the defendant did).

Outside of these factors, the defendants argue that the plaintiff must have understood the instant transaction to be a sale-leaseback with an option to repurchase because the plaintiff sent the defendants a letter indicating his intent to exercise the option on or about May 31, 2005. (*See* Docket No. 15 at 2) The court finds this argument unpersuasive because this letter was sent approximately nine months after the instant transaction was executed. (*See* Docket No. 10 at 3 (indicating that the transaction took place on August 20, 2004)) The letter thus has little bearing on the intent of the plaintiff at the time the transaction was executed, which must be the relevant consideration here.

Accordingly, because the plaintiff was indebted to the defendants and because each of the *Hensley* factors considered by the court compels a finding that the plaintiff intended his conveyance to serve as a security device, the court finds that the plaintiff has shown by clear and convincing evidence that the sale-leaseback transaction in question qualifies as an equitable

11

mortgage. *See Hensley*, 1996 WL 709375, at *5. As such, TILA applies. *See* 15 U.S.C. §§ 1602(aa)(1), 1640(e). Thus, the plaintiff has met his burden of demonstrating, by a preponderance of the evidence, that this court has subject matter jurisdiction to hear his claims. *See Golden*, 410 F.3d at 881.

## CONCLUSION

The plaintiff has established that the court has subject matter jurisdiction to hear his claims. Accordingly, the court denies the defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge